Your Honor, good morning. Gary Bertram on behalf of Appellant Calvin Colbert. I would like to start with the first issue of my brief, which is the Franks issue. That's fine. You're the appellant's lawyer, so... Officer Biel wrote the search warrant affidavit in this case in a manner to suggest that he had personally observed the activities around rooms 217 and 220 on March 11th of 2009. So excise the offending statements from the affidavit. Why is it then insufficient to provide probable cause? If we take out that third and fourth paragraph from page four of the affidavit, what we're left with is, number one, we have no ties to what happened on March 10th. Officer Biel was the only officer present on March 11th who also had been present on March 10th. He saw the person that the CI had identified as Cal, saw that person in the parking lot on March 10th, and then when it came time for March 11th, he indicated to the reviewing judge that the person he had seen personally between rooms 217 and 220 was the same person. Of course, we know that, number one, he didn't see that personally, and number two, we know that. Okay, so take that out. I mean, I guess my question is, here's what I think we have with that out, with those statements out of the equation. We have the police, and assume the legality of the search for a moment. Okay. We have the marijuana found in the dumpster, correct? Correct. Put there by your client. Correct. We have the overheard telephone conversations. Wrong case. Yeah. I'm sorry. I'm sorry. It's the dumpsters. I'm sorry. Don't worry if it's the wrong case. I'm sorry. Not to give you advice. This is Mr. Colbert at the motel. I'm sorry. I've got my list. That's why we have two search cases in a row, and I've confused them. So go on. Tell me why, excising those statements, the remaining stuff is not enough. Because the remaining evidence in the affidavit does not connect room 220 to the alleged criminal activity. We have the first female who comes down and makes contact with a ---- So what you're saying, and I apologize for my confusion, what you're saying is that there's enough in the affidavit to establish probable cause, but not probable cause to search that room? Is that what you're saying? I think that's possibly fair to say. There were certainly some activities over by the stairwell, and a black male dealing with the females from the second floor, and so there possibly could have been probable cause to arrest somebody. There was probable cause if there was a crime occurring, but not probable cause to suspect that it was occurring in that room. Exactly right. If we take out those two paragraphs, the link to 220 is gone, and if the link to 220 is gone, obviously the search of 220. So Judge Horwitz's question assumes that we would delete those two paragraphs. Why should we? Well, number one ---- Why did the district court err not? I think, number one, the affidavit clearly reads that he personally observed ---- Well, he was part of a team, wasn't he? He was part of a team. Is he entitled to rely upon the collected knowledge of all those who were there at the site? Under Davis, no, Your Honor. Under Davis, a false statement is a false statement. And whether there were other officers who could have ---- So if he would have ---- So he should have said, Officer X observed. Exactly. Was that a reckless or intentional misstatement? I think it's intentional. The reason why we know it's intentional is by what he did in the district court. When this came up in the context of the Frank's motion to dismiss, Officer Biel filed a declaration where he specifically said, I saw the stuff that occurred between rooms 217 and 220. He referenced a photograph of someone from the northeast part of the location from the motel where he could see those rooms. And that simply wasn't true. So I think that if there's any doubt as to what he meant to infer by the affidavit in the first place, his subsequent actions in connection with the motion to dismiss clearly indicate that he said exactly what he wanted to say in that affidavit, which was that he saw those things. Was there anybody actually at the scene that observed that particular movement from one room to the other? There were, Your Honor, yes. Were there other officers that were in a position to observe that? Officer Landeros, I believe, was the one who physically observed what happened between 217 and 220. And again, if that's ---- So Biel's mistake here was he should have said, I spoke with Officer Landeros, and he relayed the following to him. I'm not sure it was his mistake. I think his intent was to tie in what he saw on March 10th with March 11th, and Officer Landeros was not there on March 10th. He said he was originally, but that was corrected also. But there would ---- I take it there would have been probable cause, in your view, had he correctly described what happened. I don't think so, Your Honor, because of the fact that there were two black males involved in this case. The first one, the one who went between 217 and 220, was an unkept black male who was not the same person that Biel saw on March 10th. And so I think there still would be an issue as to probable cause for 220, because the subsequent sale that occurred to Undercover Officer White involved a different person, and there was not that connection to room 220. So, again, I think Your Honor is correct that there was probably TC that a crime had occurred, but even if we leave those in there, the connection to 220 is not sufficient. But that's not what I'm saying. Where's the nexus missing? I think that, as I understood it, that if you took all the things that were said about March 10th and you attributed them to the proper person who observed them, and all the things about March 11th, if you put it all together, where's the nexus missing to room 220? Where does the breakdown occur? The breakdown occurs in the fact that the female who brought the rock cocaine to Officer White was not tied to room 220, and the gentleman that Landero saw going between 217 and 220 was not the same person who was later on the landing, allegedly doing the deals over by the stairs. So, again, it's... But the affidavit wouldn't have made a distinction between those two people, would it? It should have. It should have. Do you think that those observations were plainly made at that time? I think that was another error in the affidavit, that BL made it seem like the person that they saw on March 10th was also the person who was going between 217 and 220. We know that's not the case. It's clear from the... Well, we know now that's not the case, but at the time, even if it had both officers, I even have to think and explain, since there were two different people who saw this, wouldn't it have seemed like it was the same person? No, but it's not one person watching this person and the other guy and saying they're not the same. Well, they discussed it on the Channel 7 recording. It's ER page 436, where they discussed the fact that this first black person they see, who goes between 217 and 220, is not the same person that had been seen the day before on March 10th. But, again, tell me why that makes a difference. Because... What we have is an observation of drug activity occurring, you say, from 217 rather than 220, and we see people going back and forth between the two rooms. Even if they're not the same people, isn't that enough to establish probable cause that 220 is involved in it? I don't think so. I mean, if we're going to go under that rationale, I guess the police could just go to that floor and just... These rooms weren't far apart, were they? They were 220, 219, 218, 217. Right down the hall, right? Right, yes. So we have drug activity in one, and we see people going back and forth between the one where drug activity is observed and the other one. Not simply going back and forth, but also moving belongings from one to the other place. Right? Later on, yes. Yeah. Well, again, I think we certainly have activity on that floor. We have activity in the stairwell. But the only connection, the 220 and 217, the only connection were those initial observations where they went in the 217 and then came out and went back in the 220, and that was a different guy than the person who was subsequently involved in these activities. We've used some of your time on this, and I've used some of your time by confusion. Could you address the public safety? Sure, sure. The Miranda issue in the case. The facts in that case for that issue are not in dispute at all. They're very, very clear. The police come in. Mr. Colbert is seated inside the room. They immediately, there's six officers, I believe, all armed, all with their weapons out. They order Mr. Colbert to the ground. He immediately complies. They immediately handcuff him behind his back. He's prone on his belly on the floor. The room is cleared by the other five officers, I believe. But they don't search him when he's handcuffed? Not yet, not yet. Okay, so I think we all, just in the background, he's in a room that's completely secure. Lots of police officers on the ground. The police officer says, and I've got the questions here, he says, do you have any weapons? First question, correct. And Mr. Colbert says, yes. Right. He then says, where is the weapon, and he points over there to the dresser. And then he says, do you have any weapons on your person? And he says, no, it's in the drawer. That's the colloquy that occurs. Exactly. Before, don't the police have the right, under the public safety exception, before they, there's an unserved suspect on the ground, you ask him if he has any weapons? If it's a volatile situation, I think that. Even in an unvolatile situation, before I stick my hand in your pocket or pat you down, I want to know, do you have any weapons? That's the last question. Well, I think, they can certainly ask, do you have anything sharp that's going to stick me, anything that's going to injure me? They can't ask, do you have a gun in your pocket? I think that's in the gray area, but if. No. I know he's handcuffed, and he may have some difficulty getting to it. The first thing you do is you pat him down, I think. You pat the person down, and I think you probably feel something at that point. Can't you just ask first, do you have any weapons? Well, if you can, if you can ask that because of the officer's safety needs, the question is, do you have any weapons on your person? Yeah, and see, there's a progression of questions here. But the district judge says, and I think somewhat reasonably, well, perhaps a perfectly worded first question would have been, do you have any weapons on your person? But we're on this scene, and the police asks the normal question. Before I pick you up and take you out and look in your pockets, I want to know if you've got any weapons, and he says yes. He probably should have asked on your person, but he didn't. And then he said, where is it? Which, of course, would be of some interest to me if I had a guy who said he had a weapon. And he said, it's over there. Doesn't that – if you put those two questions together, leave aside the third one, why aren't they okay? Because the first question needs to address the threat, the danger to the officer. So he needs to say not – he wasn't complete enough in the first question. Exactly. He should have said, do you have any weapons on your person? Isn't that what he said the third time, though? After the first two questions. Do you have any weapons on your person? Assuming that a question about weapons to someone in Mr. Colbert's physical state is proper, the first question had to be, do you have weapons on your person? Because that's what the danger was. That's what the alleged threat was. So if the third question is okay, do you have any weapons on your person, and we admit the answer, no, it's in the drawer, how do the first two questions and answers hurt your client? Because it ties into the room. The first question is, do you have any weapons? And he gestures with his head, it's over there in a closed drawer. Obviously, if he's in a room and there's – Yeah, but I guess my problem is, if it's okay to say to your client, do you have any weapons on your person, and his response to that is, no, it's in the drawer, then what's the problem – what's your difficulty with this colloquy coming in? Well, I think the answer, do you have any weapons on your person, the answer would have been no. So you think he wouldn't have disclosed where it was? I don't know, but the correct answer to that question is no. And then at that point, the alleged threat or danger to the officer is alleviated, and anything past that would be investigatory. So you're asking us to assume that his response to that would have been simply no, not no, it's in the drawer. Well, I'm sure the question would not have been, sir, do you have any weapons on your person? It probably would have been a lot more aggressive and a lot more – But they did ask that question. Do you have any weapons on your person? And his response was no, it's in the drawer. So what you're saying is, had they only asked that question, he would have responded differently than the way he actually did. I think the first question was what it should have been. Do you have anything on you? Do you have any weapons on you? The answer is no. Well, that's what you're saying the answer should have been, but his answer was no, it's in the drawer. It's your argument that the harm was created by the prior two questions that you perceive as being impermissible. And as I understand it, didn't some officer have a knee on your client's back at the time he was prone on the floor? Exactly. It wasn't just a situation where he was cuffed in a room of security. He was prone on the ground, cuffed with be-all with his knee in his back and holding his arm with his hand. There was no possible way Mr. Colbert was going to physically do anything. Well, but at some point, the officer is going to take his knee off his back. And isn't he entitled to ask him whether he has weapons on his back? You say he is entitled to ask him that. What? Given the facts of this case, I would say no. In other cases, perhaps. So he's not entitled to find out if he has a knife or a gun in his pocket. Do you have anything on you that could hurt me if I searched you? Something like that. Versus do you have any weapons? But even assuming that that question is permissible, the question you ask is certainly not. It needs to relate to the. . . So why don't we. . . Why don't we hear from the government and then we'll give you a minute or two for rebuttal. That's a lot of material. My goodness. Please. I figure I would err on the side of being over-inclusive. I don't quite think I'd measure up. All I've got is this iPad. May it please the Court. Good morning, Your Honor. Sherry Yang on behalf of the United States. Appellant here raises four distinct and separate issues. I will address them if it's okay with the Court in the order that they were raised in the brief. The first issue is this issue regarding the Franks hearing, the failure to attribute. Well, you know, the affidavit leaves a lot to be desired. No objections here, Your Honor. That's absolutely correct. It should have been more careful with. . . Your Honor, I don't believe that that's the case. Why not? Looking at the affidavit in its totality, looking at the entire affidavit, it's clear that Officer Beal here in writing the affidavit is very specific as to when the actions were, when the observations were made by the affiant, Officer Beal. The affidavit specifically mentions that other officers were involved, were on scene, and were also positioned around the motel in positions able to look at the rooms, specifically on the east and west sides where the rooms are located. In addition, Your Honor, the affidavit basically paints this narrative of the officers arriving on scene, people getting around in different positions, Officer, the affiant, and another undercover officer park at the Greyhound bus station, at which point a female approaches them to sell them crack cocaine. At some point, Officer White, the undercover, leaves that location, goes over to where the other officers are positioned, and attempts to try to conduct the buy. The affidavit notably, Your Honor, towards the end on excerpt of record page 250. Which page, 250? I'm sorry, Your Honor. 250? 250. Okay. 250. It specifically states in the fourth paragraph, first sentence, after the transaction was complete, the second black female walked away westbound on 6th Street, and the first black female accompanied Officer White across the street to the Greyhound bus station where they met Your Affiant. In other words, where they came back and met Your Affiant. I would agree, Your Honor, taking some of these paragraphs in isolation, looking at them without looking at the entire affidavit, it does omit the source of the information. But when it's looked at in its entirety, it does become more clear that there was no intent here to mislead. Should you look at the recordings as well as the affidavit? Because this is the case where they've got recordings where the officers are making statements that tend to appear, to the person who's typing the affidavit application, sort of engaging in a fictionalized construction of that affidavit? Or am I confused? If I understand Your Honor's point correctly, perhaps this will answer it. Well, the comment, as I recall, was something like, someone's going to help me write this shit up or something. Is that right?  Well, maybe take it out of context, but it doesn't sound like a guy who's really paying, like, really close attention to the details. I mean, it sounds like a person who's going, hey, let me just grab a few things, not too concerned about whether they're misleading the magistrate or not. And should we just say, pay no attention to that? It's sort of like in The Wizard of Oz, pay no attention to the man behind the curtain? Your Honor should absolutely pay attention to that. In fact, I would submit that that is actually the best evidence in this entire case that indicates that there was absolutely no intent to deceive. What happened after the transaction, after Officer White, the undercover who was wearing the recording, what happened after the transaction was he returned back to the Greyhound Station, where he met the affiant who was parked in the car. And at that point, they departed the location to go write up the affidavit for Officer Beale's signature. Officer Beale then turns over to Officer White and says, are you off? Indicating, asking, are you off of the recording? Officer White, unbeknownst to him, was still on, but he thought he was off, so he answered no. And then what happens after that is not some sort of, let's fabricate some sort of evidence, let's, well, I didn't see that part, so just create something for me. Officer Beale, what he does is he says to Officer White, I need to have you, and I believe it was something to the effect of, use some of that shit out to write my affidavit, because he had witnessed up to a certain part of the transaction, and parts of the transaction he couldn't see, because his position at the time, he wasn't in a position able to see the transaction. So wouldn't a rational law enforcement officer at that point say, hey, maybe we need to have two affidavits, or maybe we need to have an affidavit that makes reference to what someone else saw, and isn't that then intentionally misleading? Your Honor, to clarify, law enforcement is able, the affiant is able to rely upon the observations of other law enforcement. Right, and you're supposed to disclose that in the warrant application, right? Yes, Your Honor. The best practice, and arguably the acceptable practice, is to specifically attribute whatever observations are your own, versus what are third-party observations. The magistrate would want to know that, wouldn't they? They try to make a determination of probable cause, what you saw yourself, what you're relying on that someone else saw, particularly if there are differences in descriptions. You have somebody describes somebody as 5'9 and a medium build, and the other person is 6'2 and 200 pounds. Your Honor, the affidavit here, it does accurately reflect those observations made by the officer. Specifically, one officer observed the subject as, I believe, was 5'8, and another one saw him as 5'9. And the magistrate does have this discrepancy here for the magistrate to determine. And also, Your Honor, I want to just back up. Before you do, we had a Frank's hearing here. Yes, Your Honor. What did the judge find with respect to Officer Beal's intentions? The judge found that Officer Beal was not credible. There was a big argument over his credibility. And the judge found that, and I actually have the page here because I don't want to misstate anything. But the court in the court. I have that general impression, too. And I guess my question is, given that finding, what implication does that have for the validity of the search warrant? Well, the district court here conducted extensive hearings on this matter. Right. Approximately 13 to 14 hearings, Your Honor. Had Officer Beal testified? It had other issues with Officer Beal in another case, Judge Whaley. That was a separate proceeding, yes. But in this particular case, there was 13 to 14 at least hearings on this matter. And I couldn't figure out why there was so much, but evidently there were some issues about Officer Beal. The number of hearings wasn't only because of Officer Beal. It was basically it was a rolling basis. The court had particular questions, would ask the parties to address them, and then the parties would address them. There were multiple briefings requested by the court. The court actually questioned Officer Beal itself. And based on all of that, the government would here ask that the court pay some deference to the district court's finding. The district court had certainly the opportunity to observe Officer Beal's demeanor, his testimony, look at all of the evidence. It's quite convoluted. I apologize for that. But based on all of that, the district court found that Officer Beal was not uncredible. In fact, the court here. Was credible or not credible? Credible. I'll quote so I don't misstate anything, Your Honors. The court, let me put it this way. I don't find Officer Beal to be uncredible. In fact, some of the things he said are not particularly helpful to the government. So I know that he's not attempting to phrase everything in a manner to bolster the government's case. You know, he said some things that, so I don't find his credibility to be particularly at issue. Now, Mr. Colbert's credibility, however, is going to be something. And he goes on with that. So what does that translate to into whether or not Officer Beal intentionally made omissions or misstatements in the search warrant? Well, Your Honor, my response is. Did the judge make a finding that he didn't act intentionally? That he did. The court did do that. Okay. And your position is that there's evidence in the Franks hearing to support that finding? That's correct. Okay. In fact, Your Honors, it occurred to me that neither of the sides submitted the actual hearing in which the court went through the affidavit paragraph by paragraph, almost line by line, with Officer Beal. And the, I beg your indulgence, Your Honors. Give me the E.R. Cite on that. I believe it was, it was, I'm sorry, I don't have it in front of me. Oh, it was December 11, 2009. It was the hearing on that day. But the court went through paragraph by paragraph, almost line by line, with Officer Beal to try to figure out exactly what were first-person observations made by the affiant and what were third-person observations. If we take out those paragraphs that counsel was urging us to disregard, is there still probable cause in the? If those paragraphs were excised, there would not be probable cause, Your Honor. There would not be probable cause. There would not be probable cause as to Room 220. And that's something, Your Honor, I would like to touch upon, is that here we're looking at a search warrant of Room 220 and whether probable cause existed that criminal activities were occurring in 220 or that evidence would be found there. And the court here was correct that there is probable cause based on the observations made by the other officers here that there was illicit activities going on in Room 220. This whole idea of the first male being, or the second male, it's irrelevant. We're not asking if this is not an affidavit in support of an arrest warrant. This is an affidavit in support of a search warrant. So the — but, Your Honor, I would ask that the court, that based on Ninth Circuit case law, specifically Sitton, that the proper remedy, even if the court were to determine that there were omissions here, the proper remedy is not to excise those statements, but rather to insert the omitted facts, that is, that other officers saw these transactions and these observations. And once that's inserted, is there any probable cause that remains after that? That's the proper approach that the court should take. So you'd excise the unsubstantiated statements and insert the omitted statements and then read the evidence, the affidavit, in that light? My understanding is that you insert the omitted facts, whatever they may be, whether a confidential informant told you this or a police officer, another police officer, and then once with the new omitted fact inserted, does that affect materially the problem? Strike anything that you found to be false and then you'd insert anything that you found to have been omitted and then analyze whether or not there's probable cause. That's correct. And your position is if you do that, there is probable cause? There is probable cause because the heart of the probable cause here is the drug transaction between Officer White and the persons in the case. Could you spend a minute on the Miranda issue? Certainly, Your Honor. The proper test here under the quarrels and its progeny is that was there a reasonable concern for officer safety? Well, no, and let's assume that the officers have the right to ask the defendant whether or not he poses some sort of risk to them. Isn't the question do you have any weapons too broad? Under those circumstances, Your Honor, under the circumstances here, no, Your Honor. The circumstances here are very different from the cases that defendant cites in support. Specifically here, the officers had just done a crack transaction, a crack deal, with someone working out of that motel. This was a really bad area. This is downtown San Bernardino. No, I assume that they're you're not contending that they're entitled to ask him whether he has any weapons. If the first question had been we've patted you down, you have no weapons on you, are there any weapons in the room, that would be improper, wouldn't it? That would likely be improper. So shouldn't their first shouldn't their first question be so narrowly tailored as to whether or not he has weapons on him? In a perfect world, Your Honor, if especially going back in hindsight, arguably the better question would have been are there any weapons on your person or within easy reach? That would probably be the best question. Is the first question asked in your view the reasonable equivalent of that? It is, Your Honor, given the circumstances. And here defendant is on the ground. Yes, he has been handcuffed, but he's on the ground. He has not been searched yet. The room hasn't been searched yet. Defendant here is 6'4", over 200 pounds. He's 22 years old. The other officers, while they're armed, the case law does, I believe it's Riley, it does caution. Just because there are a bunch of officers that are armed doesn't mean that the situation is completely diffused. Defendant here, there were several types of dangers. There could have been dangers on his person. He could have had a, just because he was handcuffed, he could have had a weapon, for example, in his waistband. He could have had a weapon nearby, next to the bed. This was a very small room. This is a motel room. We're not talking about some barren field, as in one of the case law, or some field. We're talking about a small motel room, multiple areas where there could have been hidden dangers. The defendant's excerpt of record had a photograph of the room. I have a better copy of that photograph here, if the court would like to take a look at it. But it's the same photograph. But we're talking about a small room here. There's the bed here. The defendant was laid out over here between the bed and the table. He was, this is a small room. There are a lot of unforeseen dangers here. He could have had weapons there. He could have had weapons or dangerous needles, razor blades, whatever it may be in his pockets. There are a lot of dangers that just because somebody is on the ground and handcuffed doesn't mean that the situation is now not unsafe. So based on that. They have him under control, though, at that point, don't they? I would say you have him under some control. There's no doubt about that. He in the back or his foot on the back as well. That's correct. But, Your Honor, here there's an urgency. The officers don't have time to sit there and come up with a narrowly tailored question that nobody would scrutinize. They're here. They just arrested somebody. They need to find out where the weapons are. The room hadn't been searched yet. There could have been other people in the room. There's a lot of concerns. And, yes, there is no doubt that had defendant resisted, had there been a weapon, the five or six agents probably could have ultimately subdued him. There's no doubt. But I think the case law doesn't require us to say, well, ultimately he would have been subdued after a gunfight erupted in a small room, which is dangerous for everybody. You're over your time now. I apologize, Your Honor. Thank you. Thank you. Thank you. Your Honor, very briefly, if there's any doubt about the credibility of Officer Beal, I'd invite the court to look at page 259 of the ER, where Beal says in his police report written right after this event that Colbert was not handcuffed until after the questions were asked. That's the sort of officer we're dealing with here, someone who's... Well, we're, you know, the credibility. The district court judge made a finding about his credibility. Right. But in this particular case, in the police report, just a blatant lie. Just a blatant lie about when Mr. Colbert was handcuffed with respect to the pre-Miranda questioning. So he's fudging the facts. Your Honor talks about the spewsome shed comment. There was also the comment, as far as I'm concerned, he effing threw it at you. That shows, number one, his callous disregard for putting the truth in the affidavit. And number two, I think more importantly, it shows his concern about the link between Room 220, this second blackmail, and the drugs that were ultimately delivered to the undercover agent. Thank you very much. Thank you. We appreciate your arguments on both sides. A matter of United States-America v. Colbert is submitted, and we'll go to our last case for argument, which is United States-
judges: Erickson, Paez, Hurwitz